# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 155 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| KELSEY JONES | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Defendant Kelsey Jones has moved for a judgment of acquittal or, in the alternative, a new.  (R. 320, 422.)  For the following reasons, the Court denies Defendant's motions.

## BACKGROUND

On September 17, 2015, a grand jury returned a fifteen-count Third Superseding Indictment (the "Indictment") against Defendant and his co-defendants, Toby Jones and Mario Whitfield.  (R. 216, the Indictment.)  The Indictment charged Defendant Kelsey Jones in five of the fifteen counts.  Specifically, Count One charged Defendant Kelsey Jones with conspiring with Toby Jones and others to intentionally possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846.  Count Seven charged Defendant with knowingly and intentionally distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1).  Count Ten charged Defendant Kelsey Jones with conspiring with Toby Jones (i) to kill and attempt to kill a person, and (ii) to knowingly engage in conduct and thereby cause bodily injury to another person, with the intent to retaliate against any person for providing information to a law enforcement officer regarding the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513(f).  Count Thirteen charged Defendant with attempting to kill another person with intent to retaliate against a person for providing a law enforcement officer

with information related to the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513(a)(1)(B). Finally, Count Fourteen charged Defendant with using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The Indictment also contains a forfeiture allegation.

Defendant pled not guilty and proceeded to a nearly two-week jury trial. Defendant's co-defendants Toby Jones and Mario Whitfield proceeded with a simultaneous bench trial. During the trial, the government called the following witnesses: Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent Chris Labno, Wesley Fields, Jamie Ringswald, Mark Ringswald, Lemar "Marty" Smith, ATF Special Agent Joseph Waller, Chicago Police Department ("CPD") Officer Joseph Zaccagnino, Sprint Records Custodian Ray Clarke, Christy Miskell, ATF Special Agent Kevin Schuster, United States Secret Service ("SS") Special Agent Michael Saccomen, Robert Berk, Sidney McKamey, Tim Kucharski, Kim Hofsteadter, Kensha Barlow, and retired Oak Park Police Department Officer Robert Taylor. Defendant called Agent Labno and Michael Murphy to testify at trial. Defendant Kelsey Jones did not testify at trial.

The jury found Defendant guilty on Counts One, Seven, Ten, Thirteen, and Fourteen – all counts against him. (R. 309.) The jury also found that at least 28 grams of mixtures containing cocaine base were involved in the offense charged in Count One. Defendant now moves for a judgment of acquittal or new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. (R. 346, 422.)

## LEGAL STANDARD

## I.      Motion for Judgment of Acquittal – Rule 29

Federal Rule of Criminal Procedure Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must

enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

"In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) ("We have referred to this standard as a nearly insurmountable hurdle[.]") (inner quotation marks omitted) (citation omitted); *United States v. Molton*, 743 F.3d 479, 483 (7th Cir. 2014); *United States v. Torres–Chavez*, 744 F.3d 988, 993 (7th Cir. 2014); *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg,* 640 F.3d 239, 246 (7th Cir. 2011); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010); *United States v. Morris*, 576 F.3d 661, 665–66 (7th Cir. 2009). The reviewing court must view the "evidence in the light most favorable to the prosecution," and the defendant "'must convince' the court that, even in that light, 'no rational trier of fact could have found him guilty beyond a reasonable doubt.'" *Id.* (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)); *see also United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012); *United States v. Dood*y, 600 F.3d 752, 754 (7th Cir. 2010) (stating that the inquiry is "whether evidence exists from which any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt"). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quoting *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008)); *see also Warren*, 593 F.3d at 546. It follows that under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009).

This strict standard is in recognition that "[s]orting the facts and inferences is a task for the jury."

*Warren*, 593 F.3d at 547. Indeed, the Seventh Circuit teaches that:

> [t]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Moore*, 572 F.3d at 337 (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

## II.     Motion for a New Trial – Rule 33

Rule 33 of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion); *United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005). "'[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.'" *United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12, 126 S. Ct. 403, 163 L. Ed. 2d 14 (2005).

"'A jury verdict in a criminal case is not to be overturned lightly,'" however, "'and therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). The court "may grant a new trial if the jury's verdict is 'so contrary to the weight of the evidence that a new trial is required in the

interest of justice.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."); *see also United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011). In other words, "[t]he court should grant a motion for a new trial only if the evidence 'preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)); *see also Presbitero*, 569 F.3d at 706.

## ANALYSIS

### I.     The Evidence Was More than Sufficient to Convict Defendant

The jury found Defendant guilty of Counts One, Seven, Ten, Thirteen, and Fourteen. Viewing the evidence in the light most favorable to the government, a rational trier of fact easily could have found Defendant guilty on each of these five counts.

### A.     Drug Charges

Count One charged Defendant Kelsey Jones with conspiring with Toby Jones and others to intentionally possess with the intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846. Count Seven charged Defendant with knowingly and intentionally distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1). Viewing the evidence in the light most favorable to the government, the government established at trial that Defendant Kelsey Jones.

In order to prove Defendant guilty of the drug conspiracy, the government had to prove that the drug conspiracy existed and that Defendant knowingly became a member of it with an

intent to advance the conspiracy. Defendant's own statements to Agent Labno in April 2014 regarding his participation in the conspiracy provide enough evidence to convict Defendant on this count. Defendant admitted to Agent Labno that he sold cocaine and heroin with Toby Jones and Wesley Fields on a regular basis. Defendant admitted that he used a cellular telephone that Toby Jones had provided him to take customers' drug orders and arrange for drug deliveries. He also told Agent Labno that he regularly packaged drugs for Toby Jones (including the drugs sold to the undercover agent on March 19, 2014), allowed Toby Jones to store drugs in his apartment, and provided security for Toby Jones during drug deals (including during the March 19 deal). This testimony was corroborated by the testimony of the government's confidential informant (the "CI") and the video recordings of transactions. Furthermore, Mark Ringswald and Marty Smith both testified that they bought heroin from Kelsey Jones, Wesley Fields and Toby Jones. Moreover, co-conspirator Wesley Fields testified that he and Kesley Jones both worked for Toby Jones selling drugs. He explained how they took shifts taking orders on the phone, got the drugs from Toby Jones, delivered the drugs, and then brought the money back to Toby Jones. The evidence also proved that they kept the drugs in Kelsey Jones' apartment.

The cell phone records corroborate this testimony and support the conviction. They demonstrate Defendant's extensive contacts with his co-conspirators and drug customers.

Count Seven charged Defendant with the distribution of cocaine base on March 19, 2014 in an undercover deal. In order to prove Defendant guilty of this charge, the government had to prove the following elements beyond a reasonable doubt: 1) Defendant knowingly distributed the cocaine base at issue; and 2) Defendant knew the substance contained some kind of a controlled substance. The evidence supporting this charge was overwhelming. Agent Labno testified to Kelsey Jones' admissions regarding this drug transaction when he spoke with Agent

Labno after his April 5, 2014 arrest. Kelsey Jones admitted to the drug deal, he admitted to driving security with Toby Jones for it, he admitted to helping package the drugs for the deal that day, and he admitted that the deal involved approximately an ounce and a half of cocaine base. In addition, Kelsey Jones identified himself in a photograph at the deal. Agent Labno testified about his undercover purchase of the cocaine base. The government also introduced the videotape of the transaction. Finally, the undercover agent paid Defendants $2200 for the crack cocaine. On the same day they made the payment, a $725 payment was made for the rent at the apartment where Jones stored the drugs. The evidence was more than sufficient to prove Defendant's guilt on Count Seven.

**B.     Other Charges**

Counts Ten, Thirteen and Fourteen also charged Defendant Kelsey Jones. Count Ten charged Defendant Kelsey Jones with conspiring with Toby Jones (i) to kill and attempt to kill a person, and (ii) to knowingly engage in conduct and thereby cause bodily injury to another person, with the intent to retaliate against any person for providing information to a law enforcement officer regarding the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513(f). Count Thirteen charged Defendant with attempting to kill another person with intent to retaliate against a person for providing a law enforcement officer with information related to the commission and possible commission of a federal offense, in violation of 18 U.S.C. § 1513(a)(1)(B). Finally, Count Fourteen charged Defendant with using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The Indictment also contains a forfeiture allegation.

Counts Ten, Fourteen, and Fifteen pertain to two separate shootings at 454 North Austin Boulevard in Oak Park, Illinois—one on March 27, 2014 and one on April 2, 2014. Count Ten is

a conspiracy as to both shootings and Counts Fourteen and Fifteen relate to Defendant's shooting of the CI on April 2, 2014. The evidence at trial demonstrated that both Kensha Barlow and the CI resided at 464 North Austin Boulevard. Mr. Barlow was shot on March 27 and the CI was shot on April 2. The government established beyond a reasonable doubt that Toby Jones mistakenly shot Mr. Barlow through his apartment door on March 27 because he thought the CI lived in that apartment unit. When he realized his mistake, Defendant Kelsey Jones went back to the building on April 2 and shot the CI. They wanted to kill the CI because co-conspirator Wesley Fields had been arrested during a guns for drugs deal and Defendants blamed the CI who was cooperating with law enforcement.

In order to prove Defendant guilty of Count Ten, the government had to prove the existence of the conspiracy charged in that count and that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy. In order to prove Defendant guilty of Count Thirteen, the government had to prove the following elements beyond a reasonable doubt: 1) Defendant attempted to kill another person; and 2) Defendant acted knowingly, with the specific intent to retaliate against any person for providing to a law enforcement officer any information relating to the commission and possible commission of the federal offense charged in Count One; and 3) the officials to whom any person provided information were federal agents. The elements for Count Fourteen are as follows: 1) Defendant committed the crime of (i) conspiring to kill or attempt to kill, or to harm a person, for providing information to law enforcement as charged in Count Ten, or (ii) attempting to kill a person for providing information to law enforcement, as charged in Count Thirteen; and 2) Defendant knowingly discharged a firearm during and in relation to such crime. Viewing the evidence in

the light most favorable to the government, the government proved each element of each of these counts beyond a reasonable doubt.

Specifically, the evidence illustrated that Defendant and Toby Jones had a relationship with the CI before he was shot on April 2, 2014. Indeed, the CI introduced Agent Labno to Toby Jones and helped him arrange a drugs-for-guns exchange where cooperator Wesley Fields would bring the drugs. After law enforcement arrested Mr. Fields at this transaction, Toby Jones repeatedly attempted to contact the CI. Toby Jones then blamed the CI for the set up. At around midnight that evening, according to Mr. Barlow's testimony, two men shot him through his apartment door after demanding, "[i]t's me. . . . Open the fucking door." Mr. Barlow testified that he had never seen these two men before, suggesting that the shooter was at the wrong apartment unit. Mr. Barlow described seeing the two men through his peephole and, eventually, gave a physical description that matched Toby Jones as the shooter and Kelsey Jones.

Later, according to Lemar "Marty" Smith, the CI's neighbor at 464 N. Austin Boulevard and one of the defendants' drug customers, Kelsey Jones requested Mr. Smith meet with them at their 653 North Austin Boulevard apartment. Mr. Smith testified that Toby Jones and Kelsey Jones were both at the meeting, and Kelsey Jones inquired about the CI's location and car and, ultimately, asked Mr. Smith to report back to him or Toby Jones if he saw the CI. According to the CI, Mr. Smith contacted him some time after this meeting and warned him that Kelsey Jones and Toby Jones were looking for him. On the evening of April 2, 2014, Mr. Smith testified that Kelsey Jones also called him asking whether there were any cameras in 464 North Austin Boulevard's back parking lot. Shortly afterward, the testimony of the CI and his brother established that Kelsey Jones, with co-defendant Mario Whitfield driving the driving the get-away vehicle, shot the CI and his brother in the back parking lot of 464 North Austin. Defendant

walked up to the window of the car where they were sitting and shot them with his left hand. The CI and his brother both testified and identified Defendant from a photospread as the person who shot them. They both identified Defendant Kelsey Jones in court as the man who shot them.

In addition, telephone records and the CI's testimony corroborated these events. In sum, this evidence more than supported Count Ten's conspiratorial agreement between Defendant Kelsey Jones and Toby Jones to shoot and kill the CI. As a result, the evidence established Defendant's guilt under Counts Ten, Thirteen and Fourteen of the Indictment. The evidence does not "preponderate heavily against the verdict[.]" *Swan*, 486 F.3d at 266. Thus, Defendant's motion seeking an acquittal and/or new trial under Rules 29 and 33, respectively, is denied.

## II.     The Court Did Not Err When Ruling on the Motion to Suppress

Prior to trial, Defendant Kelsey Jones moved to suppress the items seized from his apartment on April 5, 2014. After an evidentiary hearing, the Court issued a detailed opinion denying Defendant's motion because Defendant voluntarily consented to the search of his apartment. (R. 173, Mem. Op. & Order.) The Court incorporates that prior ruling herein. Defendant has not provided any basis to establish err in that ruling. Accordingly, this aspect of Defendant's motion is denied.

## III.    The Court Did Not Err in Allowing Kensha Barlow's Testimony

Defendant argues that the Court erred when it admitted Kensha Barlow's testimony regarding the March 27, 2014 shooting. Defendant contends that the Court should not have permitted Barlow to testify that the person who shot him was "accompanied by a shorter individual who had a dark complexion, a slight build, and was wearing a hooded sweatshirt." He further takes issue with the government's argument that Kelsey Jones fits this description. The

Court issued a written ruling addressing this issue in detail and incorporates that ruling here, and denies this aspect of Defendant's motion. (R. 282.)

Count Ten charged both Toby Jones and Kelsey Jones with conspiracy to murder the CI with the intent to retaliate against the CI for providing information to federal law enforcement in connection with a narcotics conspiracy. Count Ten involved two separate shootings at 464 N. Austin Boulevard, the CI's apartment building: 1) a March 27, 2014 shooting of Kensha Barlow, and 2) an April 2, 2014 shooting of the CI. Although Defendant Kelsey Jones was not charged with the substantive crime of shooting Barlow on March 27, 2014, that shooting was an overt act in furtherance of the conspiracy. The government established at trial that Toby Jones shot Kensha Barlow through Barlow's apartment door on March 27, 2014, mistakenly believing Barlow was the CI.

Barlow identified Toby Jones as the shooter. When testifying, the Court permitted Barlow to testify regarding the description of the person with Toby Jones. Specifically, Barlow testified as follows:

Q. Now, let's talk about Man No. 2, the person who was

standing behind and next to Toby Jones and, as you said,

pacing the hallway?

A. Uh-huh.

Q. Did you get a good look at this individual's face?

A. No, sir.

Q. Did you get enough of a look at the individual -- you said

you determined it was a male?

A. Yes, sir.

Q. Were you able to determine his race?

A. Yes, sir.

Q. Did you get a look at his skin color?

A. Yes, sir.

Q. How would you describe his skin color?

A. He was dark skinned.

Q. Dark skinned?

A. Yes.

Q. Darker than Toby Jones, Man No. 1?

A. Yes.

Q. How would you describe his height?

A. Short.

Q. Was he shorter than Toby Jones?

A. Yes.

Q. How would you describe his build? Was he more muscular or
was he slimmer than Toby Jones?

A. He was a lot slimmer.

Q. And what was Man No. 2 wearing at the time?

A. He had a gray hoodie on.

Q. Was the hood up or was it down?

A. It was -- it was -- up.

Q. Was it tied around his face in any way?

A. Yes. It was tied around his head.

(Tr. 1113-14.)  During closing argument, the government did not focus on this testimony.

The Court previously found this testimony admissible.  As the Court ruled:

> In light of the "totality of the circumstances," the government's proffered evidence sufficiently identifies a conspiratorial arrangement connecting both shootings to both Defendants.  [*United States v. Cruse*, 805 F.3d [795,] 811 [7th Cir. 2015)].  Specifically, viewing the government's proffered circumstantial and direct evidence in the aggregate, the government has presented a sufficient basis to argue that both Defendants "embraced the criminal objective" to locate and cause bodily harm to the CI; "continued toward [this] common goal" through a number of phone calls, meetings, and shootings; and forged "co-operative relationships" between each other and others to successfully accomplish such unlawful goals—in part due to the CI's work with Defendants and law enforcement.  *King*, 627 F.3d at 651.  If the jury believes the government's witnesses, it can reasonably infer from these "facts and circumstances of the case" that Defendants forged an illicit agreement to kill and attempt to kill the CI, connecting both the March 27, 2014 and April 2, 2014 shootings to both Defendants.  *Iannelli*, 420 U.S. at 777, n. 10.

The Court is not persuaded by Kelsey Jones's arguments to the contrary.  He first asserts that "[t]he [g]overnment's filing presents no facts to support its conclusion that the [March 27] shooting was part of the charged conspiracy."  (R. 268 at 2.)  The proffered evidence, however, implies otherwise: Toby Jones began searching for the CI immediately after law enforcement arrested Wesley Fields and charged Toby Jones with federal offenses on March 26; approximately ten hours later, Toby Jones, accompanied by another individual, shot Kensha Barlow at the CI's apartment complex while making statements implying that Barlow was not the intended target; Kelsey Jones fits Kensha Barlow's physical description of the individual accompanying Toby Jones at the March 27, 2014 shooting; and Toby Jones continued to work with others to learn about and track down the CI for the next week until the CI was eventually shot.  The government adequately linked the above circumstances to argue that the March 27, 2014 shooting was connected to both Kelsey Jones and the alleged conspiracy.

Kelsey Jones next contends that Kensha Barlow's physical description of the accompanying individual in the March 27, 2014 shooting is unreliable.  (R. 268 at 2.)  His argument goes to the weight of this evidence, not its admissibility.  The Court observed Kensha Barlow testify to these facts at the September 15, 2015 suppression hearing.  Barlow has a basis to give such testimony.  Moreover, whether or not Kelsey Jones was the accompanying individual is not determinative of the issue.  In other words, the proffered evidence connects Kelsey Jones to the March 27, 2014 shooting, regardless of whether he was present at the shooting.  Indeed, the March 27, 2014 shooting became admissible against Kelsey Jones the moment he joined the charged criminal conspiracy.  *See United States v. Arrellano*, 757 F.3d 623, 634 (7th Cir. 2014) ("[Defendant] complains that many of the statements admitted against him were made before he allegedly joined the conspiracy.  But 'it is well established that a defendant who joins a conspiracy [takes] the conspiracy as he found it.  When he joined and actively

participated in it he adopted the previous acts *and declarations* of his fellow co-conspirators.") (quoting *United States v. Adamo*, 882 F.2d 1218, 1230-31 (7th Cir. 1989) (emphasis in original)). Thus, the March 27, 2014 shooting is admissible against Kelsey Jones to prove the conspiracy charged in Count Ten.

(R. 282.)

Moreover, the government's evidence in support of the conspiracy did not rest on this descriptive testimony from Barlow. The evidence was overwhelming, including the testimony of Marty Smith, the call records, and the evidence of a shared motive to retaliate against the CI. (*See* R. 379, Memorandum Opinion and Order for further discussion of the evidence regarding Count Ten.)

## IV.    Evidence Regarding Defendant's Alleged Alibi

Defendant states in one sentence, without identifying any specifics or providing any supporting law, that the Court erred "in denying Defendant's request to introduce evidence to corroborate his alibi, which resulted in the Government's witness's statements that he attempted to verify the alibi and was unable to do so to be unrebutted, leaving the jury a false impression." (R. 320 at 2.) Defendant does not provide any other arguments or context for this asserted error.

It appears that Defendant is challenging the Court's denial of his request to introduce evidence that there was a live broadcast of the San Antonio Spurs basketball game on April 2, 2014 in an attempt to present an alibi and to impeach Agent Labno. Specifically, Agent Labno testified that when he interviewed Defendant Kelsey Jones on April 4, 2014, regarding the shooting on April 2, 2014, Defendant told him he was at home "watching a rerun of a Spurs game." Agent Labno further testified that he attempted to verify whether there was a broadcast of a *rerun* of a Spurs basketball game on April 2, 2014 and could not find one. Defendant subsequently asked the Court to admit evidence that there was a *live* broadcast of a Spurs game that same evening. The Court denied Defendant's request to admit such evidence on relevance

grounds because the only evidence in the record was that Defendant Kelsey Jones told Agent

Labno that he watched a rerun of a Spurs game, not a live broadcast. Defendant has failed to

establish any error in this ruling.

**V.      The Buyer-Seller Instruction Was not Appropriate**

Defendant next argues that the Court erred in denying his request for a "buyer-seller" jury

instruction. As the Seventh Circuit recently made clear, a defendant is only entitled to a buyer-

seller jury instruction if "(1) [he] proposed a correct statement of the law; (2) the evidence lends

some support to the defendant's theory; (3) [his] theory of defense is not part of the charge; and

(4) the failure to include [his] instruction would deny him a fair trial." *United States v. Lomax*,

816 F.3d 468, 476 (7th Cir.), reh'g denied (May 25, 2016),, cert. denied, 136 S. Ct. 2037, 195 L.

Ed. 2d 237 (2016). "We have repeatedly stated that a district court "should give a buyer-seller

instruction where the jury could rationally find, from the evidence presented, that the defendant

merely bought or sold drugs but did not engage in a conspiracy." *Id.*, citations and quotations

omitted. Nonetheless, "[w]hen the evidence of a conspiracy is strong, we often uphold the

district court's refusal to give a buyer-seller instruction." *Id.*

Here, the evidence at trial was not sufficient to support a buyer-seller jury instruction.

Specifically, the jury heard Agent Labno testify regarding several of Defendant Kelsey Jones'

post arrest admissions that demonstrated he and Toby Jones were engaged in a joint criminal

objective to distribute drugs. Defendant admitted to Agent Labno that he regularly sold drugs

with Toby Jones using a cellular telephone that Toby Jones gave him to take customers' drug

orders and arrange for drug deliveries. In addition, Defendant Kelsey Jones told Agent Labno

that he regularly packaged drugs for Toby Jones (including the drugs sold to the undercover

agent on March 19, 2014), allowed Toby Jones to store drugs in his apartment, and provided

security for Toby Jones during drug deals (including during the March 19 deal). Specifically, Agent Labno testified regarding Kelsey Jones' admissions:

Q. And what specifically did he tell you about his drug dealing activity?

A. That he would do several things to help his brother sell drugs.

Q. What were some of the things that Kelsey Jones said he did to help his brother sell drugs?

A. He let his brother use the apartment as a stash house. He would help package drugs with his brother. He would go ahead and take care of customers with his brother. He would sell drugs specifically for his brother using a telephone, doing telephone service.

Q. Did he tell you where he got that telephone from?

A. Yes.

Q. Where did he get it from?

A. Toby Jones.

Q. Did he tell you specifically what kinds of drugs he was selling for Mr. Toby Jones?

A. Yes.

Q. What did he say about that?

A. Heroin and crack.

Q. Did he tell you about whether he ever accompanied Toby Jones when Toby was selling drugs?

A. Yes.

Q. What did he tell you about that?

A. He said that he would ride security with Toby. And I asked him what that meant. And he said he would go with his brother and accompany him when he was doing drug deals to make sure that he was safe.

*                   *                   *

A. He said that he dealt drugs and worked for Toby Jones.

Q. I'm showing you now Kelsey Jones Post-Arrest Photo 3. Who is depicted in this photograph?

A. … the CI.

Q. What did Kelsey Jones say about this photograph?

A. He said that was a picture of J.P.

Q. And did Kelsey -- what did Kelsey say about J.P.?

A. That he knew him from the 464 building; that he was someone who bought drugs from Toby and the group.

(Tr. 781-82.)

Wesley Fields, one of the co-conspirators, also corroborated that Kelsey Jones was delivering drugs for Toby Jones. (Tr. at 276, 283-85.) He described how both he and Kelsey Jones "worked the phone" for Toby Jones taking drug orders, and how they took different shifts with the phone. (*Id.* at 289-94.) Fields testified that Kelsey Jones stored the drugs in his apartment closet for Toby Jones. (*Id.* at 294-95.) Furthermore, Fields explained how he met some of the drug customers of Toby's and Kelsey's because Kelsey introduced him to them. (*Id.* at 301-02.)

Finally, the evidence regarding the March 19, 2014 drug purchase – including Agent Labno's testimony and the undercover video recording of the purchase – further corroborate that

Kelsey Jones was working for Toby Jones when he sold drugs. Given all of this evidence, Defendant Kelsey Jones was not entitled to the buyer/seller instruction. In fact, Defendant fails to identify any evidence that supports his theory.

**VI.    Agent Labno's Testimony Was Proper**

Defendant next argues that the Court erred in permitting Agent Labno to testify regarding Defendant's silence when accused of participating in the shooting of the CI and his brother, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). Agent Labno did not, however, testify regarding such silence. Instead, Agent Labno testified as follows:

> Q.:   When you first confronted Kelsey Jones with the accusation that he had shot [the CI], what did he say to you?
>
> A.:    He started talking about Joyce's peanut butter sandwiches, again.
>
> Q.    Changed the subject?
>
> A.    Yes.
>
> Q.    Did you then ask him if he understood he had just been accused of attempted murder?
>
> A.    I did.
>
> Q.    And what did he say?
>
> A.    He paused and he said yes.
>
> Q.    Did you then ask him if he was going to admit it or deny it?
>
> A.    Yes, I did.
>
> Q.    And what did he say?
>
> A.    He paused again, and then he said, I didn't shoot anyone, but you better go ahead and charge me.

(Tr. at 796.) Agent Labno never testified about any silence on Defendant's part. Instead, he

testified regarding what Defendant said in response to his questions. Indeed, "[p]rosecutors always can put in evidence of, and make arguments about, what suspects actually say." *Bland v. Hardy*, 672 F.3d 445, 448 (7th Cir. 2012). Accordingly, this argument fails.

**VII.    Newly Discovered Evidence**

Finally, in a supplemental motion, Defendant argues that "there is newly discovered evidence that suggest a new trial would be appropriate." (R. 422 at 9.) Defendant contends that his medical records from April 6, 2014, show that he was suffering from withdrawal and impairment when the law enforcement officers questioned him on April 5, 2014.

Agent Labno testified at trial that Defendant did not exhibit any signs of withdrawal or being under the influence of narcotics when Agent Labno questioned him on April 5, 2014:

> Q.      And what are some of the signs that you look for to determine if someone's under the influence?
>
> A. Depending on what they're under the influence of, someone who is talking too fast or someone who is talking inappropriately too slow. Someone who is not oriented to time or place, can't answer questions about what's going on. Someone who's uncoordinated. Somebody who has their pupils dilated artificially so or constricted artificially so, inappropriate to the lighting conditions. That type of thing.
>
> Q. At any point in your interview with Mr. Kelsey Jones, did he exhibit any of these symptoms?
>
> A. No.
>
> Q. Agent Labno, are you also familiar with some signs or symptoms that someone may be going through drug withdrawal or dope sickness?
>
> A. Yes.
>
> Q. And what are some of the signs that you look for in that regard?
>
> A. They're abnormally sweating. They're on the nod, which is, I guess, a street term for the fact that they're falling asleep uncontrollably while you're talking to them. Itching, scratching, inability to just keep still ….
>
> Did you ask him specifically about withdrawal symptoms?

A. Yes, absolutely.

Q. Why did you do that?

A. For two reasons. One, if he's not coherent or he's under the influence or in withdrawal, I didn't want to interview him. Two, we knew that we would be taking him to jail later today -- or that day. Jails will not accept somebody who is dope sick or who are experiencing signs of withdrawal.  They just won't.  You have to take them to the hospital to detox. And, so, I wanted to know ahead of time if that was going to happen.

Q. And what did Kelsey Jones say when you asked him if he was experiencing withdrawal symptoms?

A. He said he wasn't and he wasn't going to; he wasn't going to be sick.  And that was consistent with what I saw.

(Tr. 778-79.)  Defendant argues that the medical records contradict this testimony.  According to

Defendant, the government did not produce these records to him during the trial.  The

government asserts that it did produce them records to Defendant during the trial.  The Court

does not have any additional evidence regarding their production.

The medical records at issue are from Defendant's visit to Thorek Memorial Hospital in

Chicago and are dated April 6, 2014 at 3:43:35.  They reflect that Defendant's care provider was

"A. Allegretti Brownell, MD."  The record contains the following boilerplate entry:

**Narcotic abuse**:

Narcotics are pain-relieving drugs that are often abused.  They are addicting. Narcotics cause euphoria, but it often takes increasing amounts to 'feel good' and avoid withdrawal symptoms.
Overdose of narcotics causes small pupils, coma, and decreased breathing.  It's a common cause of death.  Purity of street narcotics is unpredictable. Injection of narcotics is risky for abscesses, endocarditis (heart infection), pneumonia, and AIDS.
Withdrawal from narcotics causes goose bumps, watery mouth, sweating, nasal congestion, muscle aches, abdominal cramps, vomiting, and diarrhea.  There's often restlessness and confusion.
Treatment programs are available, but you must make the decision to quit. Medication (such as clonidine) can be prescribed to control the symptoms of withdrawal.

(R. 346 at 35.)  This general overview of what narcotics are, what they cause, and the symptoms of overdose and withdrawal does not contradict Agent Labno's testimony.  While the medical records contain this general statement, they do not say that Defendant Kelsey Jones was experiencing any of the articulated side effects from withdrawal of narcotics at the time the medical personnel examined him.  They do not reflect that he had any signs of withdrawal.

As the Seventh Circuit teaches, "under Rule 33(b)(1), the 'interest of justice' requires a new trial if additional evidence (1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely impeaching or cumulative, and (4) probably would have led to acquittal."  *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016), citing *United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013); *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012); *United States v. Reyes*, 542 F.3d 588, 595 (7th Cir. 2008).   Even if Defendant has met the first prong, he has failed to meet the other three.  Defendant certainly knew he had visited the Thorek Memorial Hospital on April 6 and could have sought these records if he did not have them.  As noted above, the medical records are not even impeaching of Agent Labno's testimony, much less material.  Finally, given the overwhelming evidence against Defendant, a general statement in a medical record about what narcotics are, what they cause, and the symptoms of overdose and withdrawal would not have had any impact on the jury.  According, the Court denies Defendant's motion for a new trial based on this medical record.

## CONCLUSION

For the foregoing reasons, the Court denies Defendant's post-trial motions for acquittal and a new trial under Federal Rules of Criminal Procedure 29 and 33.


**DATED:  October 27, 2016**                                    **ENTERED**

                                                                _____
                                                                AMY J. ST. EVE
                                                                United States District Court Judge